BEH, J.
Upon the threshold of this case we are met with the objection that the bill of exceptions taken to the opinion of the court overruling the motion for a new trial, contains only a statement of the evidence given on the trial-of the cause, and not a certificate of the.facts proved : and the question presents itself, whether the rules by which this court is governed when reviewing the action of a Circuit court in granting or refusing a motion for a new trial in a civil cauáe, apply also in criminal cases ; and if they do, we have then to determine the true character of the certificate contained in the bill of exceptions, and the manner in which the same must be considered in the present case.
*The rule propounded by this court in Bennett v. Hardaway, 6 Munf. 125, was that a bill of exceptions to a decision of the court below upon a motion for a new trial, should not set out all the evidence given upon the trial of the cause ; but should state the facts which appeared to the court to have been proved by the evidence. The principle which lies at the foundation of the rule is, that as it is the function of this court to pass upon the very case which was before the court below, and with the same lights and the same materials by which to form its judgment, it cannot have that case and those lights and materials if it should be called upon to pass on the weight of testimony and the credibility of witnesses. The court below has the witnesses before it, and can observe their manner and demeanor in giving their testimony. This court only sees their testimony on paper, and has not the same means of judging of the weight due to it, and of the credibility of the witnesses. Hence an exception taken on such an occasion should not be so framed as to cast uoon this court the duty of judging as to the credibility of the witnesses or the weight due to their testimony. And it would seem that the reason for the rule applies in all its force in criminal cases. In these, this court can no better nor more successfully perform the task of weighing testimony than it can in civil cases. Its inability to determine the credibility of witnesses must be the same in both.
Hooking, then, to the bill of exceptions, it would seem from its form to be somewhat uncertain whether it was intended by the judge to be a certificate of the facts proved, or merely a statement of the evidence on both sides. The names of the witnesses are all given, excepting those who were called to prove the habits and general deportment of the prisoner, and the deceased; and each witness is stated to have “proved” what is there narrated. But the exception concludes ^thus : “And this being the testimony in the case, the jury found, &c.” The mere form of the certificate in a bill of exceptions may, it is true, be extremely fallacious for it may profess to state the facts proved, and yet in effect amount only to a mere statement of the evidence. Such was the certificate in the case of Jackson’s adm’r v. Henderson, 3 Leigh 196. And in any case, as correctly stated by Judge Baldwin, in Patterson v. Ford, 2 Gratt. 18, 33, whether a judge means to certify the testimony of a witness or the facts which he proves in the shape of evidence, is a matter that depends more on the substance than the form of the bill of exceptions. If we examine, then, the statement which follows the name of each witness as given, we will find that it is a mere narrative of his testimony as given in by him at the time. In some instances, two or more of the witnesses speak as to the same circumstances, but do not state them precisely in the same way. Thus the witness Pennington and the witnesses Clarke and Moremus are not agreed as to whether the deceased accused the prisoner of putting the card under the table before or after the prisoner claimed the five dollars of the deceased. Pen nington says that the prisoner claimed the five dollars, and that the deceased then discovered the card under the table, and accused the prisoner of putting it there; while Clarke and Moremus testify that the deceased discovered the card tinder the table, and accused the prisoner of putting it there, before anything was said by the prisoner about the five dollars. So in regard to the material fact, whether the blows which the deceased inflicted upon the prisoner were given before or after the prisoner shot the deceased, there is much uncertainty. There is some testimony tending to show that the blows were inflicted be *777 fore the shot, while the testimony of George Vaiden is that the blows were struck after the shot; and Dr. Saunders, another witness, ^expresses the opinion that the mark on the head of the prisoner must have been caused by a blow inflicted after the shot, because if the blow had been given by such a man as the deceased before he was shot, it must inevitably have crushed the skull. So the witnesses who depose as to what the deceased said to George Vaiden about his father when they were going away from the house, do not agree exactly as to what the deceased did say. Other discrepancies in the statements of the different witnesses might be noticed. It will be observed also, that with regard to several matters, some of the witnesses express merely the opinions they entertained at the time of the trial, without undertaking to state directly how the facts really were. Now the facts and circumstances attending the occurrence must of course all harmonize and consist; they cannot be varied according to the varying statements of the witnesses; nor can they be made to depend upon the correctness of their opinions, or the logical accuracy of their deductions. Neither is this court much better prepared to judge of the weight due to their opinions than of the credit to which their statement of facts may be entitled.
It seems to me that it is impossible to read the bill of exceptions without seeing that it is but a mere detail of the evidence (as the judge terms it himself in the concluding part of the bill of exceptions) given in the witnesses at the trial, excepting only the proofs as to habits and deportment, and not a certificate of the facts of the case. That it is evidence liable to be impeached by the circumstances of the transaction, whether successfully or not, and which it was the peculiar province of the jury to weigh and consider, cannot be doubted. And thus, according to the test prescribed in the opinion of Judge Baldwin in Patterson v. Ford, 2 Gratt. 18, 33, the matter of it, however certified, cannot be treated as facts proved before the *jury. In the case just referred to, the bill of exceptions was held not to have been well taken, and upon comparing it with that in the present case, it will be found (so far as parol testimony is set out) very nearly to resemble it in the form of statement and the manner of the certificate.
Regarding the bill of exceptions then as not well taken according to the rule of Bennett v. Hardaway, we must reject the evidence on behalf of the prisoner, and examine the case upon the evidence on the part of the common wealth, according to the modification or explanation of the rule established by subsequent cases. Ewing v. Ewing, 2 Leigh 337; Green v. Ashby, 6 Leigh 135; Rohr v. Davis. 9 Leigh 30; Pasley v. English, 5 Gratt. 141. And in passing upon the case as presented by the evidence, we must be governed by the same rules, and conform to the same principles, which prevail in civil cases. In the latter, it is true the jury are to weigh the evidence and to decide according to its preponderance, while in criminal cases it has been usual for the courts to advise the jury to require clear and satisfactory proof of the guilt of the prisoner before they bring in a verdict of conviction ; and if they entertain a reasonable doubt of his guilt, to give him the benefit of the doubt, and bring in a verdict of acquittal. But this is a matter for the guidance of the jury in the performance of their especial and peculiar function of responding to the questions of fact involved, and not for the government of the court before which the trial is had, in reviewing the action of the jury, and still less for that of this court in reviewing the action of that court. This court can only enquire whether the verdict is warranted by the evidence before it ; it certainly cannot enter upon an enquiry whether the jury should not have entertained a reasonable doubt of the guilt of the prisoner, and set aside the verdict or suffer it to *stand, according to the supposed result of such an enquiry. In Grayson’s Case, 6 Gratt. 712, 723, Judge Scott, in delivering his opinion, in which two of the three judges who sat with him expressed their entire concurrence, states it as a proposition deducible from the decisions of the General court, that motions for new trials are governed by the same rules in criminal as in civil cases. Judge Eomax, who was sitting in the case, also concurred in the judgment of the court, and in the opinion of Judge Scott, excepting that he was not prepared to admit in the unqualified manner therein expressed, an analogy between motions for new trials in civil cases and similar motions in criminal cases. He did not proceed to point out any difference between them, and all I apprehend that he meant was to intimate that it was a subject on which he had not matured his opinion, and did not deem it necessary to express any upon that occasion. I have been able to find no case in the decisions of the General court, nor has any occurred in this court, which establishes any different rule by which a motion for a new trial in a criminal case is to be determined from that which would prevail in a civil case ; nor do I think any sufficient reason can be shown for making any distinction between them in this respect.
Now, whatever may be the rule in cases where the bill of exceptions is well taken, and states the facts proved, and not the evidence merely ; whether in such case the appellate court would be influenced by the opinion of the jury and of the inferior court, or without regarding it, would proceed to judge for itself originally, and determine whether the proper inferences and conclusions were made and drawn from the facts, according to the opinion of Judge Allen in the case of Slaughter’s adm’r v. Tutt, 12 Leigh 147, and as would seem to have been done in the case of Governor for Fisher v. Vanmeter, 9 Eeigh 18, there can be no *doubt that where the court has to pass upon the evidence in the cause, a new trial ought not to be granted except in a case of plain deviation or of palpable insufficiency of evidence ; and not in a doubtful case, merely because the *778 court, if on the jury, would have given a different verdict. The same reasons which led to the establishment ot the rule in Bennett v. Hardaway, would apply in all their force when the court is called upon to pass upon a motion for a new trial upon the evidence against the exceptor, and would forbid its being granted except in a case of plain deviation. And this, I think, is to be deduced from the decisions of this court and the opinions of several of the judges. See Ross v. Overton, 3 Call 309; Brugh v. Shanks, 5 Leigh 598; Mays v. Callison, 6 Leigh 230; Brown v. Handley, 7 Heigh 119; Mahon v. Johnston, 7 Heigh 317; Slaughter’s adm’r v. Tutt, 12 Leigh 147. And this has been clearly recognized as the correct rule by the General court in criminal cases. Thus, in McCune’s Case, 2 Rob. R. 771, it was held that although where the finding of the jury is clearly against the evidence, or clearly without evidence to justify it, it is the duty of the court to set the verdict aside upon the application of the prisoner, and to grant him a new trial; yet if the evidence be circumstantial, and the court before which the case was tried, has refused to grant a new trial, the verdict should not be disturbed by the appellate court, even although in the opinion of that court the evidence do not amount to very clear and strong proof. And in Hill’s Case, 2 Gratt. 594, McWhirt’s Case, 3 Gratt. 594, and Grayson’s Case, 6 Gratt. 712, it is declared that a new trial should not be granted merely because the court, if upon the jury,-would have given a different verdict; but that to justify the granting of a new trial, the evidence should be plainly insufficient to warrant the finding of the jury. In Grayson’s Case, 7 Gratt. 613, *there had been two trials and two convictions ; and the court said that if in their opinion the evidence made even a probable case of guilt, they would be unwilling to disturb the verdict; but being of opinion that the testimony was not only not sufficient to prove the guilt of the accused, but that it was liardly sufficient to raise a suspicion against him, a new trial was awarded.
According to these views then, this case resolves itself into an enquiry whether, looking to the evidence on the part of the commonwealth, it is found to be plainly insufficient to warrant the finding of the jury ; for if not so plainly insufficient, we will not be justified in granting a new trial even if we should think that, had we been upon the jury, we might have found a different verdict.
The fact of the homicide by the prisoner is not controverted, and the jury by their verdict have ignored the malice which is necessary to constitute murder, and have convicted the prisoner of manslaughter. But it is urged on his behalf that the killing was clearly in self-defense, and that upon that ground he should have been wholly acquitted.
When a man is assaulted in the course of a sudden brawl or quarrel, he may in some cases protect himself by slaying the person who assaults him, and excuse himself on the ground of self-defense. Before a party thus assaulted, however, can kill his adversary, he must have retreated as far as he safely could to avoid the assault, until his further going back was prevented by some impediment, or as far as the fierceness of the assault permitted. He must show to the jury that the defense was necessary to protect his own life, or to protect himself against grievous bodily harm. 4 Black. Comm. 184; 1 Hale P. C. 481 et seq.; 1 Russ. on Cr. 661. And with regard to the necessity that will justify the slaying of another *in self-defense, it should seem that the party should not have wrongfully occasioned the necessity; for a man shall not in any case justify the killing of another by a pretense of necessity, unless he were without fault in bringing that necessity upon himself. 1 Hawk, P. C. ch. 10, § 22, p. 82; 1 Russ. on Cr. 669; 1 Hale P. C. 405.
Now, it appears that on the night in question the deceased was at the house of the prisoner, where a marriage was expected to take place; and he and the prisoner were drinking and playing cards together. An altercation took place between them, growing out of the deceased charging the prisoner with cheating. The wife of the prisoner then took hold of the deceased and reminded him of his promise to have no “fuss” there. The deceased assented, immediately bade “good night,” and went out into the yard. There he remained, however, some five minutes, apparently enraged, cursing and talking loudly. While he was thus engaged, the prisoner took up his gun and walked towards the door, but was induced by his wife’s persuasion to set the gun down. After he went out, deceased demanded his gun, which he appears to have left behind him in the house, and it was handed to him through the door by Mrs. Vaiden. Deceased then went away .on foot in company with two other persons, who rode away on horseback, and George Vaiden, son of the prisoner, went with them as far as the drawbars, some .two hundred yards from the house, for the purpose of letting them through. The deceased had been in conversation with George Vaiden, and after the party went through the gap, he continued the conversation with him as they both stood together on the outside of the fence leaning against one of the panels. The night was cloudy, but the moon was at its full, and the figure of a man could be distinguished at the distance of thirty yards. The conversation between *the deceased and George Vaiden was of no unfriendly character, and had changed from the events of the evening to a “fracas” which the deceased had had at Hunenburg court-house, of which he was giving George Vaiden the particulars. While thus engaged, and when the prisoner had approached within fifteen feet of where they were standing, the deceased, according to the testimony of George Vaiden, suddenly exclaimed, “Yonder comes the damned old rascal, and I’ll frail him now,” jumped over the fence, clubbed his gun about half way of the barrel, and rushed upon the prisoner, who told him not to approach, or he would shoot him. Deceased, however, did not stop, *779 and the prisoner gave back one or two steps, and when the deceased got within a1 few feet of him, fired. The deceased then struck the prisoner two blows with the breech of his gun, and then staggered back and fell mortally wounded, and died in a short time afterwards.
Nor, it can scarcely be said that the homicide here occurred in the course of a sudden brawl or quarrel. The altercation had taken place at the house, and the deceased had gone away, to all appearances peaceably, and had got out into the main road, and here he was standing conversing quietly with George Vaiden, when the prisoner followed him out: and this must have been between twenty minutes and half an hour after the deceased had left the house ; ample time certainly for the irritation of thedirst altercation to have subsided. Still less can it be said that the prisoner was wholly without fault in bringing the necessity of killing the deceased upon himself, if such necessity did in fact exist. After the deceased had gone away, why should the prisoner have followed him with his gun ? Why go out at all ? If it be said that the prisoner may have been afraid his son might receive some harm at the hands of deceased, the answer is, that there was *no ground for any such apprehension. The deceased had had no altercation with the son, nor had the latter participated in that which occurred between him and the prisoner. And if it be supposed that the prisoner might have thought that possibly his son might undertake to resent the insult offered to his father by the deceased, and then be brought into a difficulty with the prisoner, in which he might need his assistance, the prisoner could not but have discovered that any such apprehension was groundless ; for he must have seen when he went out, and before he was observed by the deceased, that there was no quarrel between his son and the deceased, and that they were conversing in a quiet and not unfriendly manner.. He could discover them at the distance of thirty yards, and yet he advanced to within about fifteen feet of them before he was observed by the prisoner. That he went out with his gun with the expectation of an affray, cannot be doubted, and it is far more probable that his object was to provoke one than to protect his son. In fact, whilst the deceased was still in the yard, and the prisoner’s son yet in the house, the prisoner had taken up his gun and gone towards the door unquestionably with a hostile purpose towards the deceased; but had yielded to the persuasion of his wife, and set the gun down. That such must have been his purpose is still further evinced by what he said to the witness Yates on the morning after the occurrence, when he informed him that he had killed the deceased. He added, that “there was another damned rascal in the neighborhood, who, if he didn’t look sharp, would be killed too; that the deceased was a damned dog, and ought to have been killed twenty years ago, and that some body had to do it.” And he asked the witness if he didn’t think so ? This was early in the morning, but the prisoner was sober; and it reflects a strong light upon the true character *of the occurrences of the previous evening, and the motives and conduct of the prisoner. It tends to show that the necessity for slaying the deceased, if such necessity lay upon the prisoner, was of his own seeking, and self imposed. He made no allusion in this conversation to any peril of his life in which he was placed by the assault made upon him by the prisoner, though he did say that the prisoner had struck him two blows on the head before he shot him. The necessity which seemed at that time to be impressed upon his mind, was rather that of ridding the community of one whom although at that moment lying stiff and cold in death on the ground in a fence corner, and slain by his hand, he stigmatized as a damned dog that ought to have been killed twenty years before, than of taking his life for the purpose of avoiding imminent danger of death to himself.
Considering the whole conduct of the prisoner on the evening in question in connection with the state of feeling which he avowedly entertained towards the deceased, I think it very difficult to say that he was free from fault upon that occasion, or that his case comes within the rules which renders homicide justifiable or excusable on the ground of necessary self-defense. Nay, if the jury had gone further and found the prisoner guilty of murder, it might be .a matter of grave consideration whether the verdict could have been disturbed upon the ground that there was no sufficient evidence of the malice which is necessary to constitute that crime. Certainly, I am not prepared to say that this verdict is a plain deviation from right and justice, and that the evidence is clearly insufficient to warrant it.
In conclusion, I would remark that it can scarcely be doubted the exact weight due to the testimony of George Vaiden must have been matter of serious consideration with the jury. He was the only person *who was present at the time the homicide was committed, aud he was called as a witness almost as a matter of necessity. But he was the son of the prisoner, and of course under the strongest inducements to make his account of the occurrence as favorable to his father as he could; and there would seem to be some apparent discrepancy between his a ccount of the manner in which the affray took place, and the spot at which the death wound was inflicted, and circumstances proved by himself and others. It is certainly true as a general rule, that a party is not permitted to impugn the credibility of a witness called by himself, by general evidence showing him to be unworthy of belief. There are exceptions, however, to the rule, as in the case of a subscribing witness whom the law obliges the party to call. Whether the case where there is but a single witness present at the homicide, and who is therefore called on behalf of the commonwealth in a prosecution for murder, should constitute another exception, as argued by the attorney general, I undertake to express no opinion. But in any case, the party call *780 ing a witness may give evidence in direct contradiction of what he has testified ; and not only where the witness was innocently mistaken, but even where the evidence may have the effect collaterally of showing that he was unworthy of belief. 1 Greenl. Ev. § 443, and cases cited in the note. X forbear, however, to dwell upon this point, because in the view I have already taken, the result must be unfavorable to the prisoner ; and it is therefore unnecessary to determine whether there is not .such necessity for passing on the weight due to the testimony of' the witness, George Vaiden, as would according to the rule preclude the court from undertaking to review the action of the jury and of the court below.
I think no sufficient reason is shown for disturbing *the verdict of the jury, and am of opinion to affirm the judgment.
ALLEN, P., and MONCURE and SAM-UELS, Js., concurred in the opinion of Lee, J.